UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00220-TBR

WILLIAM WINCHESTER                                                    Plaintiff,

v.

CITY OF HOPKINSVILLE                                                Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon competing motions for summary judgment. Plaintiff William Winchester, proceeding *pro se*, first filed his motion for partial summary judgment. (Docket No. 8.)  The City of Hopkinsville ("the City") responded, (Docket No. 25), and Winchester replied, (Docket No. 20).  The City also filed a motion for summary judgment, (Docket No. 26), to which Winchester has responded, (Docket No. 35), and the City has replied, (Docket No. 39).  Fully briefed, these matters stand ripe for adjudication.

Winchester claims that the City rejected his application for a crime scene technician position with the Hopkinsville Police Department ("the Department") in violation of the Age Discrimination and Employment Act ("ADEA"), the Kentucky Civil Rights Act ("KCRA"), and the Fair Credit Reporting Act ("FCRA").  For the reasons set forth below, the Court will DENY Winchester's motion, (Docket No. 8), and will GRANT the City's motion, (Docket No. 26).

### Factual Background

Winchester, who was fifty years old at the time of his application, contends that he discovered the crime scene technician listing on the Kentucky Office of Employment and Training's job board and on the City of Hopkinsville's website.  According to the posted job description, crime

scene technicians are charged with "collecting, preserving, and processing evidence from a crime scene or suspected crime scene" and are "[r]esponsible for control of all evidence and found items submitted to the Property System through use of computer identification numbers, controlled access, and security system." (Docket No. 25-2, Job Description, at 2-3.) The essential functions of the job emphasize the importance of preserving a "[s]trict chain of custody," "dispos[ing] of excess or unneeded evidence in accordance with evidence destruction protocol," preserving confidentiality," and maintaining a "diplomatic and courteous" demeanor in professional interactions. (Docket No. 25-2, Job Description, at 3.) The posting indicated a preference for applicants with an associate's degree in a science field.

Significantly, the minimum qualifications included "good moral character." (Docket No. 25-2, Job Description, at 3.) Furthermore, Kentucky law requires members of the police department to be persons of "integrity." *See* KRS 95.440(2) ("No person shall be appointed a member of the police or fire department unless he is a person of sobriety and integrity and has been an orderly, law-abiding citizen.").

The parties primarily dispute whether Winchester's moral character and integrity rendered him a qualified candidate. From 2000 to 2009, Winchester practiced law in Tennessee. At the time he applied for the Hopkinsville job, the Tennessee Board of Professional Responsibility had publicly censured him and suspended his law license. He was ultimately disbarred for "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." (Docket No. 25-1, TBA Disciplinary Records, at 35.) This publicly adjudicated misconduct, the City argues, leaves no doubt that Winchester does not fulfill the job's statutory requirement of integrity. Furthermore, the City contends that Winchester willfully concealed his previous career as an attorney by omitting it from both his application materials and his subsequent interview. This purported evasiveness, the City says, is sufficient to disqualify Winchester and terminate his candidacy.

2

Winchester denies any deceit, arguing that he informed the City of his law practice via a "current resume" that he submitted to indicate his initial interest in the position.  (Docket No. 1, Complaint, at 2.)  Winchester states that after he "was informed that resume was not acceptable as a job application," he then submitted the required paper application form.  (Docket No. 1, Complaint, at 2.)  This document, entitled "Curriculum Vitae," acknowledges Winchester's juris doctor degree from the University of Memphis in 2000, as well as his nine years of practice as a solo practitioner in Memphis, Tennessee.  It also lists eight "notable cases."  (Docket No. 8-6, Winchester Affidavit, at 3-6.)  The City insists that hiring officials did not receive Winchester's Curriculum Vitae during the hiring process, that it was not included among the other application materials in his personnel file, and that he provided it for the first time on May 23, 2014, during the course of discovery for this lawsuit.

The parties do not otherwise dispute the contents of Winchester's application materials.  On his City of Hopkinsville job application form, dated November 12, 2012, indicates that he graduated from high school in Memphis, Tennessee, before studying physics at the University of Memphis.  No other course of study is indicated.  (*See* Docket No. 25-3, Winchester Application, at 2.)  Winchester indicated in the appropriate space that he served in the United States Air Force from September 1985 to November 1992.  (Docket No. 25-3, Job Application, at 2.)  The second page of the application requires applicants to list their three most recent employers.  Winchester indicated that he was currently employed at Sam's Club in Paducah, Kentucky; that he was unemployed from July 2010 to July 2012; and that he chaired the general studies department at Brown Mackie College in Hopkinsville, Kentucky, from May 2008 to July 2010.  (*See* Docket No. 25-3, Winchester Application, at 3.)  Winchester also submitted a letter, dated November 12, 2012, summarizing his employment history and educational background.  The letter acknowledges the same employment

history discussed above; the only reference to his pre-2008 experience is to his Air Force service. (Docket No. 25-5, Winchester Letter.)

In early December, Winchester received a series of emails from Kenneth Grabara, the City's human resources officer, informing him that in-person assessments would be administered on December 19, 2012. On that date, Winchester and ten other applicants participated in the assessment process. The group was told that they would be contacted in January 2013 regarding the position. On January 21, 2013, Winchester requested an update from Grabara, who informed him that background checks were pending.

On February 5, 2013, Detective Inman interviewed Winchester at the Department using a list of scripted questions pertinent to the background investigation. (*See* Docket No. 25-4, Winchester Deposition, at 63, Exhibit 4.) Winchester alleges that during this interview, he learned that he was one of five remaining candidates. He claims that during the interview, another detective informed Inman that one of the candidates had been eliminated as a result of the background check; Winchester assumed that he was then one of four remaining candidates.

Winchester's affidavit indicates that during the interview, he stated that he could not recall if he had filed bankruptcy in 2000, but emailed Inman the next day to confirm this second bankruptcy. The email reads, in relevant part: "I checked and there was a Chapter 13 filed in 2000. It was after a second round of proceedings from my divorce from my first wife. There was an issue of whether or not I would file it since I just started practicing law, but it was filed." (*See* Docket No. 8-6 at 8.)

After the interview, Inman drafted a document entitled Police Background Investigation Summary.[1] In the Summary, Detective Inman notes that Winchester indicated no full time work

---

[1] This document encapsulated Winchester's application his employment history as follows:

from 1992 until 2008, but explained that he instead worked various part-time jobs and pursued

educational opportunities.  The Summary continues, "Winchester obtained his TN attorney license in

2000 and practiced law in Memphis from 2000 until his heart attack in 2007 as a criminal defense

attorney.  He also owned and operated his own private investigator business in which he was a

licensed PI." (Docket No. 8-5 at 6.)  Inman also noted a number of financial concerns stemming

from Winchester's Trans Union credit report,[2] including six accounts in collections, all for medical

bills totaling $56,617.00, and nine current negative accounts, totaling $100,000.00. [3]  The report also

showed that Winchester filed for Chapter 7 bankruptcy in 2007.  Inman concluded that Winchester's

candidacy for the position should be terminated.   (Docket No. 8-5 at 6.)

---

> Winchester was in the Air Force from 1985-1992.  He obtained the rank of captain.  He left the Air Force under honorable conditions with 30% disability and is able to re-enlist.  Winchester did not list working from 1992-2008.  He said he went from part time job to part time job and continued his education. Winchester obtained his TN attorney license in 2000 and practiced law in Memphis from 2000 until his heart attack in 2007 as a criminal defense attorney. He also owned and operated his own private investigator business in which he was a licensed PI.  He lists Brown Mackie College from 2008-2010, he listed that he was the Academic Department Chair.  He holds a BA of science in Physics with a minor in Criminal Justice and Mathematics.  Due to his minor he has taught classes in crime scene investigation, police and criminal procedure. He said he taught his classes from a defense attorney perspective.  He listed restructuring as to why he was laid off.  He was unemployed again from 2010-2012.  He now works at Sam's Club from 7/2012-current but has asked that we not contact Sam's Club.

(Docket No. 8-5 at 6.)

[2] In its Answer, the City denies that Winchester's credit report served as the basis for its decision not to recommend Winchester.  Pointing to this denial, Winchester argues that the City should be estopped from offering any information derived from his credit history or consumer report as a basis for its decision not to recommend Winchester. (Docket No. 10.)  However, Winchester admits that during his interview with Inman, he was aware that Inman referred to the reports, reviewing them line-by-line and seeking Winchester's response and any necessary corrections.  Winchester admitted that his outstanding delinquent debt totaled $147,000.  Winchester ultimately confirmed both of his prior bankruptcies, as well as his outstanding student loans and medical bills.  Because Winchester himself independently verified this information, the Court will permit the City to rely upon it.

[3] An overview of Winchester's credit report reflected six accounts in collections, nine current negative accounts, eleven trade accounts, and nine installment accounts.  Winchester disputes the $100,000 that the credit report indicated he owed in student loans that were then in current negative collections.  Winchester indicated to Inman that he owed $80,000.00 in student loans at the time of the interview.  At deposition, he estimated that this figure totaled $80,000 or $90,000.

Sergeant Tracey Mayberry agreed with Inman's recommendation.  In a memorandum to hiring officials, Mayberry confirms that she reviewed Winchester's file and discussed the background investigation with Inman.  According to Mayberry, Winchester admitted to his second bankruptcy only via email the day after his interview.  In her affidavit, Mayberry recalls that Inman told her that Winchester had not mentioned his law practice before his interview; she notes that if she had seen a document from Winchester referencing his law practice, she would not have confirmed Inman's statement in her memorandum.  (Docket No. 25-12, Mayberry Deposition, at 2-3.)

On February 11, 2013, Grabara informed Winchester via email that he was no longer being considered for the position.  The next day, Winchester replied to Grabara, asking why he had been excluded from the process.  Grabara summarily replied, "We are considering candidates whose skills, experience and background are more suited for the City of Hopkinsville's Police Department."  (*See* Docket No. 1 at 5.)  The same day, Winchester pressed Grabara for a more specific response; receiving none, he forwarded the email to additional Department personnel on February 12, 2013.  Approximately two weeks later, he forwarded the email thread to Dan Kemp, Hopkinsville's mayor.  Kemp's brief response noted simply that "other candidates were deemed more qualified for the position."  (*See* Docket No. 1 at 6.)  The position was ultimately awarded to Samantha Moore, a twenty-two year-old individual whom Winchester alleges had neither a science degree nor relevant work experience.

On May 18, 2013, Winchester submitted a Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC").  Winchester emailed Grabara, Kemp, and Police Chief Guy Howie a demand letter on June 12, 2013, detailing his EEOC complaint and ADEA claim.  On June 26, 2013, a claim examiner from the City's insurance carrier informed Winchester that his claim had been denied and that neither the carrier nor the City wished to pursue settlement negotiations.  The EEOC issued a Right to Sue letter on October 29, 2013.

Winchester received the EEOC's charge file on December 18, 2013, as a result of a Freedom of Information Act request.  The City informed the EEOC during its investigation that Winchester had been eliminated from further consideration for the position "due to inconsistencies, inaccuracies, and misstatements contained in his application and that were made during the telephone interview." (Docket No. 8-5 at 2-3.)[4]  The City maintained that Winchester's age did not bear upon the hiring process, as evinced by the fact that an applicant older than Winchester proceeded to the final interview.  (Docket No. 8-5 at 3.)  This candidate was removed from consideration only when she expressed concerns about her safety at crime scenes.  (*See* Docket No. 25 at 18.)  Winchester denies having made any false statements, contending instead that the City's investigation was flawed. (Docket No. 1 at 7.)  Specifically, he alleges that the City obtained false information from his credit report.  He protests that he had no opportunity to review or correct such information.

---

[4] The City's counsel explained to the EEOC:

> On February 5, 2013 Hopkinsville Police Department Detective Chuck Inman interviewed Mr. Winchester by telephone.  During this interview, Mr. Winchester was asked several times if he had filed bankruptcy.  Mr. Winchester denied filing bankruptcy, but subsequently admitted filing bankruptcy in an email to Detective Inman.  Detective Inman also found during his background investigation that Mr. Winchester provided inconsistent statements in his application, which were factually inaccurate.  On February 6, 2013, Detective Inman completed a police background investigation summary, and did not recommend Mr. Winchester be allowed to continue in the application process, due to the above referenced inconsistencies and misstatements.

> On February 6, 2013, Lieutenant Alexander issued an internal memorandum to [Sergeant] Mayberry, outlining concerns with applicant William Winchester. Due to the inconsistencies and inaccuracies that were discovered in the background investigation and interview, Lieutenant Alexander agreed with Detective Inman that Mr. Winchester should not continue in the hiring process. [Sergeant] Mayberry concurred with this opinion of February 6, 2013.  Based on this information, Chief Guy Howie decided to remove Mr. Winchester as a candidate in the hiring process.

(Docket No.8-5 at 2.)

**Legal Standard**

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits indicate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). A mere scintilla of evidence in support of the plaintiff's position will not do; instead, he must present evidence on which the trier of fact could reasonably find for him. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette*, 90 F.3d at 1177*; see also Anderson*, 477 U.S. at 249-50 ("If the evidence is merely colorable . . . or is not significantly         probative . . . summary judgment may be granted.") (internal citations omitted)).

**Analysis**

**I.      Arguments concerning the City's alleged admission**

As a preliminary matter, the Court will address a recurring objection that appears throughout Winchester's filings. Winchester contends that the City admitted during discovery that it received a

document detailing his work history and which acknowledges his law practice; therefore, he argues that this fact has been conclusively established.   Winchester points to his seventh request for admission, which reads, "Admit that the Plaintiff William Winchester mailed in a current resume to the city of Hopkinsville, but was informed that a resume was not . . . acceptable as a job application, but that a City of Hopkinsville application would have to be used to apply for the position."  The City responded, "Admit."   (Docket No. 25-6, Defendant's Responses to Plaintiff's First Request for Admissions, at 5.)

As discussed above, Winchester states that before submitting the City's application form, he mailed a "resume" that described his employment history, including his work between 1992 and 2008.   This four-page document, entitled "Curriculum Vitae," included a description of his law practice from August 2000 to April 2009.  Winchester contends that he submitted the application form only after being told that the CV was insufficient.  Winchester's discovery documents and court filings refer to this document as a CV and a resume interchangeably.[5]  Along with the application form, Winchester submitted a letter detailing his work experience and education.  Winchester refers to this document as a cover letter.  The letter did not acknowledge Winchester's law practice.

---

[5] For example, the City's interrogatories and Winchester's responses provide, in part:

> Interrogatory No. 6:  State why you failed to inform any representative of the City of Hopkinsville that you had worked as an attorney until you were asked to do so.

> Answer:  Objection.  False premise.  Without waiving said objection, I did not fail "to inform any representative of the City of Hopkinsville that [I] had worked as an attorney."   I mailed my resume to Defendant and was subsequently informed that I needed to complete a standard application.   My resume, previously mailed to Defendant, as Defendant admitted in Plaintiff's Request for Admission, contained said information.

(Docket No. 25-8, Winchester's Responses to the City's First Set of Combined Interrogatories, Requests for Production of Documents, and Requests for Admissions, at 6-7.)

The City disavows Winchester's conclusion, contending instead that this matter arises from a misunderstanding, with the parties referring to the same document using differing terms. The application form invites applicants to "[a]ttach resume as appropriate." (Docket No. 25-3, Job Application, at 3.) Relying upon this phrasing, the City asserts that its admission to Winchester's Request No. 7 was intended only to reference the one-page cover letter that was submitted with his application form. Because the City denies having received his CV,[6] it argues that the letter was the only document in Winchester's file that resembled a resume. Moreover, according to the City, the CV document was not listed in Winchester's Rule 26 disclosures or provided to the City on February 26, 2014. (*See* Docket No. 25-11, Winchester's Rule 26 Disclosures.)

The apparent misnomer appears throughout the parties' discovery exchanges. For example, the City's thirteenth request for admission reads, "Admit that the application you completed for the position informed you to attach your resume as appropriate, and you attached a letter dated November 12, 2012, which is attached as Exhibit C hereto." (Docket No. 25-7, City's First Set of Combined Interrogatories, Requests for Production of Documents, and Requests for Admissions, at 9.) Winchester responded, "DENIED, as stated. I had previously mailed in my resume, as Defendant admitted in Plaintiff's Request for Admissions, and when I was informed that I needed to complete the form application, I included a cover letter, your Exhibit C, as is custom when applying for jobs." (Docket No. 25-8, Winchester's Responses to the City's First Set of Combined Interrogatories, Requests for Production of Documents, and Requests for Admissions, at 10.

---

[6] Grabara, the City's human resources officer, explained at deposition that he received and compiled all applications for the position, as well as any supplemental materials. Grabara averred that he could not recall seeing Winchester's curriculum vitae before its disclosure in the litigation. (*See* Docket No. 25-9, Grabara Affidavit.) Police Captain Eric Myers, who reviewed the applications at least twice, also testified that the curriculum vitae was not included with Winchester's application. (Docket No. 25-10, Eric Myers Affidavit, at 3 ("This document was not included in Mr. Winchester's file at any time when I reviewed it either at the Human Resources office or at any time or place thereafter. I had never seen or heard of the document until it was provided to me by counsel in July 2014."). The Court acknowledges that Winchester has objected to this evidence and will consider his arguments below.

The Court acknowledges Winchester's argument that the City has alleged facts contrary to matters conclusively established by its admissions and thus insufficient to raise genuine issues of material fact. *See Haun v. Humana Inc.*, 651 F. Supp. 120, 122 (6th Cir. 1986) ("Matters admitted under Rule 36 are conclusively established. . . . Further, matters inconsistent with admissions conclusively established under Rule 3 cannot be considered by the Court in ruling upon Defendants' Motion for Summary Judgment.") (citations omitted). So strict a reading, however, would not comport with either fairness or practicality. The parties' dispute arose from neither bad faith nor deliberate action, but from a genuine miscommunication. It appears that the City simply did not contemplate that its would-be admission encompassed Winchester's CV. Whether the City actually received Winchester's CV presents an issue of fact; however, the Court finds no evidence that the City admitted to having received this document.

## II.     Admissibility of the City's affidavits

Winchester has moved to exclude the affidavits of Tracey Mayberry, (Docket No. 28), Eric Meyers (Docket No.32), and Kenneth Grabara (Docket No. 34). He contends that Mayberry's and Meyers' affidavits contain inadmissible hearsay and that Grabara's is based upon speculation.[7]   The Court will address each in turn.

Winchester points to Paragraphs 4 and 5 of Mayberry's affidavit. In Paragraph 4, Mayberry states:

> I do not recall specifically what documents were in Mr. Winchester's file. Detective Inman told me that Winchester had not mentioned his prior law practice before his interview. I noted this in my memo and I would have reviewed all file documents at that time. If I had seen a resume or other document from Mr. Winchester describing his work as a lawyer I would not have confirmed Detective Inman's statement.

---

[7] Winchester also contends that the affidavits contains statements that contradict previously admitted facts; however the Court's discussion in Section I of the City's purported admissions renders this argument moot.

(Docket No. 25-12.)   However, the City does not offer Inman's statement by way of Mayberry's to prove the truth of the matter asserted—that is, that Winchester failed to disclose his law practice prior to the interview.   Rather, it provides evidence of Mayberry's state of mind, supporting her claim that she never saw the CV document.   If she had seen such a document, she explains, she would have noted her disagreement with Inman's characterization.   The assertion's truth is of little significance:   "As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual by showing it was ultimately incorrect."   *Singleton v. Select Specialty Hospital-Lexington Inc.*,2009 WL 192577 at *12 (W.D. Ky. Jan. 27, 2009) (citing *Manzer v. Diamond Shamrock Chems Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).   The statement serves as evidence of the reasonableness of Mayberry's report.   Accordingly, it does not constitute hearsay.   *See* Federal Rule of Evidence 801(c) (defining hearsay).

Winchester raises similar concerns with portions of Eric Meyers' affidavit, which reads, in relevant part:   "I also spoke with Detective Inman, who told me that Winchester had repeatedly denied a prior bankruptcy until finally admitting it the day after the interview.   I also remember the concern that Winchester's prior law practice had not been initially disclosed."   (Docket No. 25-10 at 8.)   The same reasoning applies here.   The statement was not offered for its truth—that is, that Winchester did, in fact, deny filing bankruptcy and practicing law—but for its impact upon Meyers' decision to terminate Winchester's candidacy and whether that decision was reasonable.   *See, e.g.*, *Means v. City and Cnty. of San Francisco Dept. of Public Health*, 749 F. Supp. 2d 998, 1005 at n.2 (N.D. Cal. 2010) (citing *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1456 (9th Cir. 1983)).   This information is relevant to determining whether the City considered Winchester's age.   Accordingly, the affidavit is admissible.

Finally, Winchester seeks to exclude the affidavit of Kenneth Grabara, alleging that it contains speculation.  Grabara provided, in relevant part:

> I have recently reviewed the document . . . which is entitled "Curriculum Vitae," which I understand has been produced by Mr. Winchester [in] the above litigation.  I cannot recall this document being included in Mr. Winchester's file at any time.  I don't recall ever seeing or hearing of the document until it was provided to me by counsel in July 2014.

(Docket No. 25-9.)

Although Winchester insists that Grabara's statement must be excluded, the Court disagrees. Grabara's recollection of the contents of Winchester's file has probative value.  Winchester objects to Grabara's statement that he "cannot recall" the CV but does not categorically deny its existence. While this argument may pertain to the statement's probative value, it does not indicate that Grabara's testimony is unduly speculative.  Accordingly, this affidavit will be admitted.

## III.    The ADEA claim

The Age Discrimination in Employment Act (ADEA) renders it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623 (2004).  Claims brought under the KCRA are "analyzed in the same manner" as ADEA claims.  *Williams v. Tyco Elec. Corp.*, 161 F. App'x 526, 531 & n.3 (6th Cir. 2006) (citing *Ky. Center for the Arts v. Handley*, 827 S.W.2d 697, 699 (Ky. Ct. App. 1991)); *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984) (citing *Ky. Comm'n on Human Rights v. Commonwealth of Ky., Dept. of Justice*, 586 S.W.2 270 (Ky. Ct. App. 1979)) (explaining that because "[t]he Kentucky age discrimination statute is specially modeled after the Federal law . . . in this particular area we must consider the way the Federal act has been interpreted,"

13

and applying federal precedent to the plaintiff's KCRA claim).  Therefore, the Court will address these claims simultaneously.

A plaintiff may establish a claim of age discrimination by offering either direct or circumstantial evidence.  *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).  When a plaintiff presents direct evidence of discrimination, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 53 (6th Cir. 2000).    Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (citing *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995); *Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 694 (Mich. Ct. App. 1997)).   "Consistent with this definition, direct evidence of discrimination does not require a fact finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by actual prejudice against members of the protected group."  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (internal citations omitted).

Here, however, Winchester presents no direct evidence of age discrimination.  When a plaintiff's claims are based on circumstantial evidence, the Court applies the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (creating the burden-shifting analysis for Title VII claims); *see Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (age discrimination claims under the ADEA are analyzed under the *McDonnell Douglas/Burdine* burden-shifting analysis).  This analysis designates three stages of proof:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employer's rejection."  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Brudine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).  "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (alteration in original) (quoting *Burdine*, 450 U.S. at 253).

Modified for failure-to-hire ADEA cases, the *McDonnell Douglas* test first requires a plaintiff to establish a *prima facie* case by demonstrating that (1) he was a member of the protected class—that is, that he was at least forty years old at the time of the alleged discrimination; (2) he applied and was rejected; (3) he was otherwise qualified for the position; and (4) the successful applicant was significantly younger than the plaintiff.  *Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69 (6th Cir. 1982).  Here, there is no dispute that Winchester was fifty years old when he applied for the job, that he was not ultimately selected, and that the position was awarded to a significantly younger applicant.  The parties' essential dispute, then, centers upon whether Winchester was qualified for the position he sought.

a. **Was Winchester qualified?**

The City denies that age was a factor in its decision not to hire Winchester.  Instead, it first contends that Winchester's undisputed history of professional discipline disqualified him from serving as a crime scene technician.  Winchester's disciplinary record from the Tennessee Bar Association ("TBA") reflects that he was publicly censured and was suspended from practicing law on three occasions—most recently for abandoning his law practice and obstructing the subsequent disciplinary proceedings.  Winchester was ultimately disbarred; this suspension remained pending at the time of his interview.

The TBA's Board of Professional Responsibility ("the Board") first disciplined Winchester on May 15, 2003, publicly censuring him for not providing clear advice to a client who surreptitiously recorded a home visit by a guardian ad litem.  The Board found that Winchester may have "tacitly agreed" to his client's scheme.  (Docket No. 25-1, TBA Disciplinary Records, at 2.) The Board concluded that Winchester wrongfully participated in making a secret recording, "circumvent[ing] the requirements of disciplinary rules" and "engag[ing] in deceptive conduct which is detrimental to the administration of justice."  (Docket No. 25-1, TBA Disciplinary Records, at 2.)

The Board next held a hearing on a Petition for Discipline containing six complaints against Winchester concerning his "pattern of failing to diligently represent his clients and failing to communicate with his clients."  (Docket No. 25-1, TBA Disciplinary Records, at 9.)  The Board observed that he failed to keep his clients reasonably informed regarding their cases, withheld client files, failed to make reasonable efforts to expedite his clients' litigation, and committed professional misconduct.  Aggravating factors included Winchester's pattern of misconduct, the multiple offenses he committed, and his refusal to acknowledge the wrongful nature of his conduct.  Consequently,

Winchester was suspended from practicing law for two years.  (Docket No. 25-1, TBA Disciplinary Records, at 11-12.)

Similar issues arose again, with another Petition for Discipline filed against Winchester on February 25, 2010.  On January 20, 2011, the Board entered Findings of Fact and Conclusions of Law and Judgment against Winchester.[8]  The Board determined that Winchester failed to communicate with clients and opposing counsel, despite their persistent effort.  Winchester was adjudged to have committed several counts of misconduct, including abandoning his office with no indication of how he could be reached; neglecting client files and failing to return them upon request; and abandoning cases without proper withdrawal.  The panel noted several violations involving money; for example, Winchester allegedly accepted payment while providing little or no legal representation and failing to adequately account for funds he accepted from a litigation funding group.  Winchester was also found to have ignored the board's repeated requests for information and documentation.  The Board concluded that Winchester "engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation by continuing to misrepresent to his clients the status of their cases and the work being done on their cases and by making misrepresentations to the Board regarding this client files," including by filing a false affidavit.  (Docket No. 25-1, TBA Disciplinary Records, at 35.)  It listed eight aggravating factors, including Winchester's prior disciplinary offenses and pattern of misconduct, his refusal to acknowledge the wrongfulness of his conduct, his "dishonest or selfish motive," his harming "particularly vulnerable" victims, his indifference to making restitution, and "bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with the rules of the Board by failing to respond to complaints made against him, destroying files, filing meritless pleadings and making every effort to delay the conclusion of this matter."  (Docket No. 25-1, TBA

---

[8] The January 20, 2011, judgment also references two private informal admonitions:  the first on June 9, 2008, for "repeatedly emailing pleadings without required memorandum to judges and parties without properly filing the pleadings," and the second on July 21, 2008, for "failing to communicate with a client and failing to file her case despite being paid to do so."  (Docket No. 25-1, TBA Disciplinary Records, at 15.)

Disciplinary Records, at 37.)   As a result, the panel entered judgment ordering that Winchester be disbarred and required to pay restitution to various victims.[9]

If the City may properly rely upon evidence of Winchester's bar discipline at this phase, there can be little argument that Winchester has not demonstrated that he was qualified to serve as a crime scene technician.   Whatever the circumstances that contributed to the decline of his practice, it is virtually impossible to reconcile Winchester's repeated and willful breaches of fundamental ethics with the statutory prerequisite of "integrity."   Should the Court determine that Winchester has failed to prove that he was qualified for the position, he will have failed to establish a prima facie case on summary judgment review.

**b.   May the Court consider after-acquired evidence in this analysis?**

The issue turns upon whether the City may rely upon the evidence reflecting Winchester's attorney discipline and eventual disbarment.   Winchester argues that these sanctions are of no moment because the City did not learn of them until after it had decided to end his candidacy. Because no City officials were aware of this information at the time hiring decisions were made, Winchester argues that it does not constitute evidence of his qualifications for the job.

The Supreme Court examined a similar issue in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), an ADEA wrongful discharge case.   The *McKennon* Court assumed that

---

[9] On August 5, 2011, the Supreme Court of Tennessee entered an Order of Enforcement effectuating the 2009 set of Findings and Judgment and decreed that Winchester would be suspended from practicing law for two years. (Docket No. 25-1, TBA Disciplinary Records, at 44-45.)   Winchester's petition requesting the court to vacate its order was denied on November 30, 2011.   (Docket No. 25-1, TBA Disciplinary Records, at 47-50.)   On May 21, 2013, the same court issued an Order of Enforcement concerning the 2011 Findings of Fact and Conclusions of Law, disbarring him from the practice of law.   (Docket No. 25-1, TBA Disciplinary Records, at 54-56.)   The Release of Information announcing Winchester's disbarment also referenced two additional suspensions, one for failure to pay professional privilege tax and the second for failing to comply with continuing legal education requirements. (Docket No. 25-1, TBA Disciplinary Records, at 58.)

the plaintiff was terminated due solely to her age and in violation of the ADEA.  *Id.* at 356.  During the plaintiff's deposition, her employer learned that she had copied various confidential documents regarding the company's finances, took them home, and divulged them to her husband.  *Id.* at 355.  After this incident came to light, the company mailed the plaintiff a letter informing her that her removal and copying of the confidential records was in violation of her job responsibilities; the company advised her for a second time that her employment was thereby terminated.  *Id.*  The district court awarded summary judgment to the company, finding that the plaintiff's misconduct justified her termination and that no remedies were available to her under the ADEA.

On appeal, the Supreme Court considered whether all relief must be denied when an employee is discharged in violation of the ADEA and the employer later discovers evidence of wrongdoing that would have led to her legitimate termination if discovered earlier.  *Id.* at 354.  Resolving a circuit split, the Court reasoned that because the ADEA's remedial provisions are designed both to compensate injured employees and to deter employers from discriminating, after-acquired evidence does not serve as a total bar to relief under all circumstances.  *Id.* at 358.  The Court explained that the company "could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason."  *Id.* at 360.

The Sixth Circuit applied *McKennon* in *Serrano v. Cintas Corp.*, 699 F.3d 884, 903 (6th Cir. 2012), a class action raised by the EEOC  on behalf of 112 women and others similarly situated. These plaintiffs alleged that Cintas, the defendant, engaged in a discriminatory pattern or practice of failing to hire females for a certain position.  *See id.* at 889.  The EEOC appealed the district court's entry of judgment in favor of Cintas.  On appeal, the Sixth Circuit considered which framework for establishing a prima facie case of disparate treatment applied in a gender discrimination case:  the *McDonnell Douglas* burden-shifting framework discussed *supra*, or the pattern-or-practice framework articulated in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324

(1977).[10]   The court determined that the *Teamsters* framework applied.   It remanded the case for further action, due largely to the district court's errant application of the *McDonnell Douglas* framework in granting summary judgment to Cintas.

After conveying this holding, the Sixth Circuit noted "one point of law worth clarifying given its potential relevance to the future proceedings."  *Id.* at 903.   The district court found that eight of the claimants were ineligible for employment due to allegedly dishonest representations in each of their employment applications.   On appeal, the EEOC argued that the district court errantly considered this after-acquired evidence of dishonesty in determining the applicants' eligibility.  *Id.* at 903.   The Sixth Circuit explained that the district court considered the after-acquired evidence at the incorrect stage of the *Teamsters* analysis.   Such evidence was not relevant to the plaintiffs' threshold showing of a pattern or practice of discrimination; rather, it concerned Cintas's burden to rebut the prima facie case by demonstrating a lawful reason for its decision.  *Id.* at 903 (citing *Teamsters*, 431 U.S. at 360).

---

[10] As stated above, *McDonnell Douglas* establishes a framework by which plaintiffs may establish individual claims of disparate treatment.   The *Teamsters* framework serves a similar function in a different context:   it functions as a method of proof for cases of disparate impact by showing a discriminatory pattern or practice.  *Serrano*, 699 F.3d at 892 (citing *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 183 (3d Cir. 2009)).   The Sixth Circuit explained that *Teamsters* imposes a distinct burden upon the plaintiff, who must establish

> "that unlawful discrimination has been a regular procedure or policy followed by an employer or a group of employers."  *Teamsters*, 431 U.S. at 360, 97 S.Ct. 1843.   Upon that showing, it is assumed "that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy" and, therefore, "[t]he [plaintiff] need only show that an alleged individual discriminatee unsuccessfully applied for a job."  *Id.* at 362, 97 S. Ct. 1843.   The burden then shifts to the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons."  *Id.*

*Serrano*, 699 F.3d at 893.

*Serrano* observed, "[U]nder *Teamsters*, as under *McDonnell Douglas*, the district court's conclusion that any dishonesty by an individual in an employment application operates as a per se bar to relief, regardless of whether Cintas was aware of the dishonesty at the time of the employment decision, conflicts with the careful framework established in *McKennon*." *Id.* (citing *McKennon*, 513 U.S. at 358 ("It would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation.")).  The court noted precedent suggesting that after-acquired evidence of dishonesty should be considered only in the remedial phase of a case, citing two wrongful discharge cases involving alleged dishonesty. *See id.* (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 416 n.2 (6th Cir. 2004) ("Thus, while this post hoc, additional ground for plaintiff's termination may be relevant to the calculation of any damages, it is irrelevant to the determination of whether defendant improperly terminated plaintiff under the ADA or the FMLA in the first instance."), *cert. denied*, 543 U.S. 1146 (2005); *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 718 n.3 (6th Cir. 2003) ("Regardless, this misrepresentation clearly was not a factor in Honda's decision to separate Cavin because Honda was not aware of the misrepresentation at the time of Cavin's termination.  We do recognize, however, that the misrepresentation may be relevant to the calculation of Cavin's damages.")).

At first blush, Winchester's argument that *McKennon* and *Serrano* bar consideration of his attorney discipline appears convincing.  However, a deeper analysis reveals key differences that call into question the applicability of the *McKennon-Serrano* principles here.  First, distinct frameworks apply:  the *Serrano* plaintiffs, who confronted the low bar of *Teamsters*, were not required to demonstrate that they were qualified for the job—only that they applied for it.[11]  Furthermore, the

---

[11] The facts before the *Serrano* court concerned allegations of disparate impact rather than the disparate treatment that Winchester claims.  As stated above, two distinct analyses apply to those claims, *Teamsters* to the former and

*Teamsters* framework does not require plaintiffs to prove that they were qualified for the job they sought.  *See Serrano*, 699 F.3d at 896 ("Unlike under the *McDonnell Douglas* framework, where a plaintiff must show membership in a protected class, objective qualifications for the job, and an adverse employment decision from which others similarly situated but not part of the protected class were spared . . . Under *Teamsters* the plaintiff must demonstrate the existence of a discriminatory procedure or policy."  (internal citations omitted)).  Although the *Serrano* plaintiffs were allegedly dishonest during the application process, there is no indication that honesty was a prerequisite for the jobs at issue.  By contrast, Winchester's case centers upon a statutory edict that makes "integrity" an essential qualification for the job.

Of course, this Court does not depart from the Sixth Circuit's dicta without significant consideration.  However, as a sister district court concluded, "The substantial majority of courts recognize that *McKennon* does not apply to issues which do not turn on the employer's *motivation* in making the challenged employment decision."  *Colin v. Guilford County Bd. of Educ.*, 2010 WL 3911426 at *6 (M.D.N.C. Oct. 5, 2010).  *Colin* cited decisions of the Third, Tenth, Seventh, Fifth, and Ninth Circuits that did not apply *McKennon* to review of an employment discrimination plaintiff's prima facie case.  *Id.* (citing *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 621 (3d Cir. 1996), *abrogated on other grounds*, *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999) (finding the after-acquired evidence an affirmative defense "that becomes meaningful once the plaintiff has established a *prima facie* case of discrimination"); *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275 (10th Cir. 1999) (holding that "*McKennon*'s discussion on after-acquired evidence [did] not apply" to a Title VII failure-to-hire action and "the evidence to which Plaintiff object[ed] was

*McDonnell Douglas* to the latter. This key distinction suggests that *Serrano*'s holding is limited only to disparate impact cases.

nonetheless admissible to show that Plaintiff's prima facie case was not supported by a preponderance of the evidence."); *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1251 (7th Cir. 1990) (determining that the after-acquired evidence rule does not apply at the prima facie stage); *McConathy v. Dr. Pepper/SevenUp Corp.*, 131 F.3d 558, 563 (5th Cir. 1998) (per curiam) (declining to apply *McKennon* to statements "being used . . . in relation to [plaintiff's] job qualifications, a matter which has nothing to do with the motivation behind her employer's action."); *Mantolete v. Bolger*, 767 F.2d 1416 (9th Cir. 1985) (distinguishing the use of after-acquired evidence which "would be relevant as part of the defendant's efforts to rebut [plaintiff's] prima facie case of discrimination," from its use to "justify [defendant's] refusal to hire" which would be "questionable.")). *See also Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1108 (5th Cir. 1995) ("We are persuaded that the pertinent inquiry, *except in refusal-to-hire cases*, is whether the employee would have been fired upon discovery of the wrongdoing, not whether he would have been hired in the first instance.") (emphasis added);

Practical application of this reasoning confirms its soundness.   As the Third Circuit explained:

> The rationale underlying consideration of after-acquired evidence is that the employer should not be impeded in the exercise of legitimate prerogatives and the employee should not be placed in a better position than he would have absent the discrimination.  Cutting off relief at the time that a legitimate discharge would have occurred accomplishes these ends.  Merely asking whether the employee would have been hired fails to recognize that an employer may retain an individual who has performed successfully, despite lack of formal qualification."

*Shattuck,* 49 F.3d at 1108.  Similar reasoning applies here:  if Winchester's allegations are true, any resolution of his claims should remedy his injury but not place him in a better position than he would have enjoyed without the alleged discrimination.   Here, however, a key distinction is at play.  In

typical cases, an employer—perhaps motivated by charity, or by bad judgment—may choose to hire a poorly-qualified candidate; it may even choose one whose application or other representations were riddled with fraud.  In a discrimination case, such an applicant could argue that he would have been hired but for the employer's discriminatory motive.  But this hypothetical would be impossible under the instant facts: the City could not have entertained the idea of hiring Winchester, as state statute made "integrity" a job requirement.  While this factor is admittedly subjective, the Court is confident that Winchester's publicly adjudged history of "dishonesty, fraud, deceit, [and] misrepresentation" leaves him unable to satisfy this requirement.  (*See* Docket No. 25-1, TBA Disciplinary Records, at 35.)  To apply *McKennon* here would effectively permit Winchester to evade the "otherwise qualified" prong of his prima facie case, thus placing him in the legal position of a qualified candidate—a better position than he could have attained without the alleged discrimination.

Considering the authorities cited above and the logical extension of the parties' arguments, the Court concludes that neither *Seranno* nor *McKennon* apply here:  although those cases concern allegedly dishonest applicants, they do not address dishonesty that occurred *before* the application and that bears upon the applicant's qualifications.  Consequently, evidence bearing upon Winchester's lack of qualification to serve as a crime scene technician may be considered at this stage of the case, even if hiring officials lacked this information at the time of their decision.  This clear evidence that Winchester was not qualified for the position renders him unable to raise a prima facie case of discrimination.

### c.  Did Winchester demonstrate pretext?

Even if Winchester had established a prima facie case for his ADEA claim, the City has satisfied its burden to show that it had legitimate, nondiscriminatory reasons for not hiring Winchester.  First, the City contends that Winchester deliberately concealed information that would

have disqualified him for the position.   According to the City, hiring officials noted inconsistent statements concerning his previous law practice and bankruptcies.   A document entitled "Applicant Interview Questions" reflects Inman's notes during Winchester's interview.   (*See* Docket No. 8-5 at 8-13.)   According to this document, Winchester indicated that he had achieved a master's degree in physics; there is no suggestion of a law degree or career as an attorney.   However, the National Comprehensive Report obtained by the City as part of Winchester's background check indicated that he was licensed as an attorney in Tennessee.   (*See* Docket No. 25-4 at 69, Exhibit 5.)   At deposition, Winchester admitted that his experience as an attorney would likely have been of interest during the City's hiring process.   (*See* Docket No. 25-4, Winchester Deposition at 51:25-52:8.)

The City argues that Winchester was evasive throughout the interview process.   Inman's notes from the interview reflect that Winchester avoided a direct question regarding outstanding civil judgments against him.   (*See* Docket No. 25-4, Winchester Deposition, at 78:21-25.)   Winchester refutes Inman's characterization, explaining that although he did not recall the question, he would have said yes due to defaulting on his student loans.   (Docket No. 25-4, Winchester Deposition, at 79:17-23.)   However, Winchester admitted at deposition that he did not acknowledge a judgment against him for malicious prosecution that was filed for enforcement in the Christian Circuit Court. (*See* Docket No. 25-4, Winchester Deposition, at 81:8-83:11.)   He also claimed not to remember having filed a second bankruptcy, not acknowledging it until he emailed Inman the day after his interview.[12]   This evasiveness arguably reflected poorly upon Winchester's integrity and suggested that he lacked the integrity necessary to serve the Department.   *See* KRS 95.440.

---

[12] The notes elaborating upon questions concerning Winchester's financial wellbeing are somewhat unclear.  Next to the phrase, "Explain your ability to honor debts," Inman wrote, "'07 Bankruptcy – pay cash now."  The following question asked applicants, "Explain the status of delinquent accounts"; the word "Yes" is written in response.  In the next question, Winchester acknowledged that he had filed for bankruptcy; Inman wrote, "'07 in Memphis – [Chapter] # 7."

In a Memorandum regarding Winchester's background investigation, Sergeant Mayberry provided as follows:

> Detective Inman has completed the background investigation on William Winchester.  I agree with Detective Inman, Mr. Winchester should not continue in the hiring process.  Mr. Winchester filed for bankruptcy twice, denying this when asked several times, he finally admitted it to Det. Inman in an email after leaving from his interview. He lied on his application stating he worked part time and was a student, when he actually was working as an attorney and owned a PI business.  When asked about this he stated the job was too stressful.

(Docket No. 8-5 at 7.)

Winchester's alleged attempt to gloss over certain biographical information was not the City's only concern.  The City also argues that Winchester's ongoing financial troubles left him unfit for a job that requires acute discretion.   When Winchester applied for the job, he had filed for bankruptcy twice and continued to face credit issues.   Meyers' affidavit explains his apprehensions: "The bigger issue in my mind was that the applicant at some point confirmed two bankruptcies and current credit issues.   This factor raised serious concerns with regard to the Crime Scene Tech. position due to the high importance of accountability and the risk of impropriety when placing a person in such a role who may be financially irresponsible or have financial pressures." (Docket No. 25-10, Eric Myers Affidavit, at 3.)  Mayberry expressed similar concerns:  "Financial responsibility is especially important for a Crime Scene Technologist because along with other evidence they must handle cash recovered from drug busts and manage the bank account where such funds are placed. Mr. Winchester's two admitted bankruptcies, admitted ongoing credit problems and his evasiveness

---

Winchester does not dispute that he failed to admit his second bankruptcy during the interview.  However, he contends that the possibility of a second bankruptcy was discussed and that he provided additional information via email as required.  (Docket No. 8-1 at 7.)

during the process were all red flags for potential problems in my opinion."  (Docket No. 25-12, Mayberry Affidavit, at 3.)

Pointing to this evidence, the City argues that Winchester was not qualified to assume responsibility for preserving crime scene evidence, including cash seized from drug proceeds.  (*See* Docket No. 25-2, Job Description.)  Had Winchester been hired, the City argues, his attorney discipline would be a prime target for cross-examination from criminal defense attorneys and in evidentiary disputes.  Moreover, the City contends, should a plaintiff file civil litigation regarding mishandled evidence or loss of funds, Winchester's previous could serve as the basis of a lawsuit for negligent hiring.

Because the City has articulated a nondiscriminatory reason for not hiring Winchester, the burden shifts back to Winchester to prove that the City's reason is pretext for age discrimination. *Blizzard v. Marion Technical College*, 698 F.3d 275, 285 (6th Cir. 2012).  To show pretext, a plaintiff must show by a preponderance of the evidence "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge."  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993)).  When a plaintiff grounds his pretext argument upon relative qualifications, he must demonstrate that he is either (1) "a plainly superior candidate, such that no reasonable employer would have chosen" the other candidates over him, or (2) "as qualified if not better qualified than the [chosen candidate], and the record contains other probative evidence of discrimination."  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citing *Burdine*, 450 U.S. at 253).

Winchester insists that age discrimination motivated the City's decision not to hire him.  As discussed above, he insists that he submitted a CV that detailed his complete educational and work

history, including his law practice.   The City denies that it received this document.   But even assuming that Winchester mailed the CV and the City received it, no evidence suggests that hiring officials saw such a document, and neither Winchester nor Inman mentioned it during the interview. However, Winchester listed no employment between 1992 and 2008 on the application form itself.[13] Furthermore, there is no dispute that Winchester did not forthrightly answer a direct question concerning prior misconduct and public adjudications of his actions. Because hiring officials suspected that Winchester withheld pertinent personal information, they permissibly ended his candidacy.

Winchester offers several arguments as to why his qualifications exceed those of Moore, who was ultimately selected.   He contends that he scored higher on both the Crime Scene Technician Applicant Written Test and the Standard National Police Officer Selection Test.   (Docket No. 8-1 at 4.)   Perhaps this evidence creates an issue of fact whether Winchester was *as qualified as* Moore; however, there is no evidence upon which a rational fact-finder could determine that Winchester was "a plainly superior candidate, such that no reasonable employer would have chosen" Moore.   *See Provenzano*, 663 F.3d at 815.   Winchester admits that at the time he applied, he had no experience as a crime scene technologist.   (Docket No. 25-8, Winchester's responses to the City's First Set of Interrogatories, at 3.)   Although Winchester insists that his educational background exceeded Moore's, her education related more closely to crime scene technology: at the time of her application, she was only three classes short of a police science degree with a concentration in crime scene investigation.   (*See* Docket No. 25-13 at 7; Docket No. 25-6 at 4.)   While Moore's course of study

---

[13] During discovery, Winchester propounded a request for admission asking the City to "[a]dmit that Plaintiff William Winchester did not lie on his job application."   The City first objected to the request's ambiguity, then continued, "Without waiving said objection, and assuming the request refers to the printed application form, the request is denied because the application lists no employment between 1992 and 2008, which is a misrepresentation by omission."   (*See* Docket No. 8-1 at 7-8.)

was related to forensic science, Winchester's transcripts indicate no coursework specific to crime scene technology.  (*See* Docket No. 25-4, Winchester Deposition, at 61-62, Exhibit 3.)

Furthermore, Winchester contends that his financial position was no worse than those of the remaining applicants.  The City has admitted that younger applicants were allowed to continue in the hiring process despite current negative accounts to collections. [14]   However, the City contends that none of the four applicants whose candidacies progressed beyond Winchester's shared his significant financial issues or delinquent credit.  The City points to the application files of Samantha Moore— who was ultimately hired for the position—as well those of Josh Turner, Kelly Walker, and Martha White, all of whom continued in the hiring process after Winchester had been excluded.  (*See* Docket No. 25-13.)  Although Walker's outstanding student loan balances totaled $20,000, only $660 was past due at the time of the report.  Furthermore, older accounts were apparently transferred to new loans or written off; current accounts were indicated to be "paid or paying as agreed."  Winchester's report, however, reflected accounts actively in collection, with at least $147,000 at issue.

Accordingly, Winchester must point to "probative evidence of discrimination."  *Id* at 816. This he has failed to do.  Perhaps most decisively, an individual who was older than Winchester surpassed him in the hiring process.  This applicant's candidacy ended only after she declared herself unable to work at a crime scene, one of the job's essential functions.  Therefore, even when viewed in the light most favorable to Winchester,  no evidence suggests that the City's proffered legitimate, nondiscriminatory reasons for failing to hire him either lacked a basis in fact, did not actually motivate the decision, or were insufficient to motivate the decision.  *See Manzer*, 29 F.3d at 1084.

---

[14] REQUEST NO. 27.  Admit that other applicants for the Crime Scene technician position were younger than Plaintiff William Winchester that were recommended to "continue in the hiring process" by detectives other than Detective Inman had credit reports with "Current negative accounts" and/or "Collections."

ANSWER: Admit.

(Docket No. 8-4 at 9.)

Because Winchester has failed to show that the City's decision not to hire him was at all related to his age, the Court will grant the City's motion for summary judgment on this claim.

## IV.    Fair Credit Reporting Act Claim

Finally, the Court turns to Winchester's allegation that the City violated the FCRA by failing to inform him that it used information from his credit report in making an adverse employment decision. Section 1681b(b)(3) of the FCRA states, in relevant part:

> [I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—(i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter, as prescribed by the Bureau under section 1681g(c)(3) of this title.

15 U.S.C. § 1681b(b)(3). The FCRA defines an adverse action as "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii).

The City concedes that it failed to comply with the formalities of the FCRA.  However, it contends that Winchester cannot prove that he suffered injury as a result of its oversight.  A technical violation alone will not justify awarding damages:  Winchester must prove that he has been injured. *See Lewis v. Ohio Prof'l Elec. Network LLC*, 248 F. Supp. 2d 693, 701 (S.D. Ohio 2003) ("To prevail on a claim for actual damages under the FCRA, Plaintiff must prove that Defendants' violation of the Act caused him injury.") (citing *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) ("Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages,' which is one of the remedies under the Fair Credit Reporting Act.") (citations omitted)).  Winchester cannot demonstrate

that the City's hiring decision was based upon inaccurate information or that he was otherwise harmed by the violation.  This lack of evidence of damages proves fatal to his claim.

Winchester executed a document acknowledging his understanding that the City would use his consumer report during the hiring process, and the application form advised that he could request the investigative information.  Winchester testified that Inman discussed both reports with him in their entirety, line by line, correcting any discrepancies.  Winchester eventually confirmed two prior bankruptcies as well as ongoing delinquent credit issues.  He discovered only one alleged error in the background check; although Inman calculated Winchester's educational debt to total $168,534, Winchester advised him that the correct number was "nowhere near that."  (*See* Docket No. 25-4, Winchester Deposition, at 105.)  As a result, Inman reduced this figure to $100,000 in his Summary and noted that Winchester claimed that he actually owed only $80,000.[15]  (*See* Docket No. 25-4, Winchester Deposition, at 100, Exhibit 8.)   Accordingly, Winchester admitted debts of approximately $147,000, while Inman's summary reflected a total of up to $157,000.  No evidence suggests that this relatively slight variance would have redeemed Winchester's application or otherwise altered the City's decision, particularly in light of the concerns discussed above.

Because he has presented no evidence constituting damages under the FCRA, no reasonable jury could conclude that the City's violation caused any injury.  Because Winchester has failed to prove an essential element of his FCRA claim, summary judgment will be awarded in the City's favor.

### Conclusion and Order

Based upon the foregoing, the Court finds that the City's motion for summary judgment, (Docket No. 26), should be, and hereby is, GRANTED.   For the same reasons, Winchester's motion

---

[15] Winchester has since testified that his student loan balance is "somewhere around $80,000, $90,000."  (*See* Docket No. 25-4, Winchester Deposition, at 101.)

for summary judgment, (Docket No. 8), is DENIED.   Winchester's various motions to exclude, (Docket Nos. 10, 28, 32, and 34), are hereby DENIED, and any remaining motions are DENIED as MOOT.  Winchester's claims are hereby dismissed with prejudice.